STATE OF NORTH CAROLINA
v.
HUGO ALBERTO BELTRAN-PONCE, Defendant.
No. COA09-79.
Court of Appeals of North Carolina.
Filed April 6, 2010.
This case not for publication
Attorney General Roy Cooper, by Assistant Attorney General Vaughn S. Monroe, for the State.
J. Clark Fischer for defendant-appellant.
GEER, Judge.
Defendant Hugo Alberto Beltran-Ponce appeals his convictions for attempted trafficking by possession of marijuana and conspiracy to traffic marijuana, primarily contending that the trial court erred in denying his motion to dismiss. We hold that, although the question is very close, when the evidence is viewed in the light most favorable to the State and all inferences are drawn in the State's favor, the evidence is sufficient to survive a motion to dismiss.

Facts
At trial, the State's evidence tended to show the following. On 21 February 2008, Sergeant Steve Fredrickson with the Narcotics Division of the Buncombe County Sheriff's Department received a phone call from the manager of a Federal Express in Asheville, North Carolina. The manager said he had received information from the manager of a Federal Express store in Texas that two packages arriving in Asheville were suspected of carrying narcotics. These packages were suspicious because they were coming from Texas, a known source of drug activity; they had no return address on them; the postage was prepaid; and the names on the packages were "pretty generic." The first package was addressed to Sean Trout at 379 Craigmont Road in Black Mountain, North Carolina. The second package was addressed to John Michels at 3 Buck West Court in Swannanoa, North Carolina.
Sergeant Fredrickson arranged to have the driver of the Federal Express delivery truck carrying the packages meet him and the City of Asheville's K-9 unit at a warehouse on Highway 70. After a narcotics dog indicated the presence of narcotics in the two suspicious boxes, Sergeant Fredrickson obtained a search warrant and took the boxes back to his office. Officers subsequently disassembled the boxes and found marijuana inside. A smaller portion of the marijuana was then repackaged in the original boxes and Sergeant Fredrickson dressed up as a delivery person for Federal Express. He drove to 379 Craigmont Road, walked up to the door of the mobile home, and said, "I have a package here for Sean Trout." The person who answered the door denied being Sean Trout or knowing anything about the package.
Sergeant Fredrickson then drove to 3 Buck West Court. He knocked on the door of the mobile home at that address. A woman standing in the window motioned for him to go around to the back of the mobile home. Sergeant Fredrickson, however, remained standing in front of the mobile home, and a man later identified as defendant then came around the back side of the mobile home towards him.
As defendant approached, Sergeant Fredrickson asked, "John Michels?" Defendant walked hurriedly towards Sergeant Frederickson, nodding his head "yes." Sergeant Fredrickson asked defendant twice more if he was John Michels, and defendant said yes. As Sergeant Fredrickson put the package on the ground, he said, "You're John Michels," and defendant nodded his head and pointed to his chest. Sergeant Fredrickson then gave defendant a delivery log and asked him to sign on the signature line. Defendant signed "J-o-h-n . . . M-a-i-c-o" on the sixth signature line. Defendant was reaching down to pick up the package when several agents arrived and arrested him.
Defendant then said: "That's not me. That's not me. I have my i.d." When officers searched the mobile home, they found a woman and two young children, but no other contraband apart from identification cards officers believed might have been fraudulent. Officers found a Bank of America card with defendant's picture and the name "Jose Castro." They also found a Mexican identification card with defendant's picture on it and the name "Juan Manuel Beltran Molina."
Defendant was charged with trafficking by possession of marijuana and conspiracy to traffic marijuana. When the cases were called for trial, the State amended the charges to attempted trafficking by possession of marijuana and conspiracy to traffic marijuana. The jury found defendant guilty of both charges. The trial court sentenced defendant to 25 to 30 months imprisonment for the conspiracy conviction and a concurrent term of six to eight months for the attempted trafficking conviction. Defendant timely appealed to this Court.

I
Defendant first contends that the trial court erred in denying his motion to dismiss the charges for insufficient evidence. "This Court reviews the trial court's denial of a motion to dismiss de novo." State v. Smith, 186 N.C. App. 57, 62, 650 S.E.2d 29, 33 (2007). "Upon defendant's motion for dismissal, the question for the Court is whether there is substantial evidence (1) of each essential element of the offense charged, or of a lesser offense included therein, and (2) of defendant's being the perpetrator of such offense." State v. Powell, 299 N.C. 95, 98, 261 S.E.2d 114, 117 (1980). Substantial evidence is that amount of evidence "sufficient to persuade a rational juror to accept a particular conclusion." State v. Goblet, 173 N.C. App. 112, 118, 618 S.E.2d 257, 262 (2005). We view the evidence in the light most favorable to the State. Id.
With respect to the attempted trafficking charge, defendant contends that the record contains insufficient evidence that he knew the box contained marijuana. N.C. Gen. Stat. § 90-95(h)(1) (2009) provides that "[a]ny person who sells, manufactures, delivers, transports, or possesses in excess of 10 pounds (avoirdupois) of marijuana shall be guilty of a felony which felony shall be known as `trafficking in marijuana'. . . ." This Court has held that "[w]hile not expressly included in N.C. Gen. Stat. § 90-95(h)(1), it is well-settled that the offense of trafficking a controlled substance by possession requires `knowing possession.'" State v. Robledo, 193 N.C. App. 521, 525, 668 S.E.2d 91, 94 (2008) (quoting State v. Shelman, 159 N.C. App. 300, 307, 584 S.E.2d 88, 94, disc. review denied, 357 N.C. 581, 589 S.E.2d 363 (2003)).
With respect to controlled deliveries, "[t]he State [is] not required to show who placed the [controlled substance] in the parcel. It [is] required to show defendant knew or expected that the package contained [the controlled substance] and intended to control its disposition or use." State v. Rashidi, 172 N.C. App. 628, 636, 617 S.E.2d 68, 74, aff'd per curiam, 360 N.C. 166, 622 S.E.2d 493 (2005). Thus, "[t]he State must show more than the package was addressed to defendant and contained [a controlled substance], since such proof does not necessarily establish defendant's knowledge of the contents of the package and his intent to exercise control over the [controlled substance]." Id.
In State v. Richards, 155 N.J. Super. 106, 113-14, 382 A.2d 407, 411 (N.J. Super. Ct. App. Div.), certification denied, 77 N.J. 478, 391 A.2d 493 (1978), a New Jersey court observed that jurisdictions addressing this issue
have uniformly concluded that knowing or intentional possession cannot be inferred merely from the fact of delivery to defendant by mail or common carrier of a sealed package containing the illegal goods, and that acceptance of the package by itself cannot yield an inference of knowledge by the recipient of its contents. Rather, something more by way of attendant circumstances must be shown from which an inference can be drawn that defendant also knew what was in the package and intended to assert possessory control over it.
The court noted that these cases usually fall into one of "two general factual patterns":
Either the arrest, which was virtually simultaneous with the delivery, was predicated not only on the delivery itself but on a totality of circumstances surrounding the delivery which implied defendant's knowledge of the contents of the package and intent to exercise dominion over it, or the arrest was made some time after the delivery had been completed and defendant, in the interval between the delivery and the arrest, took some affirmative action vis-a-vis the package from which these inferences of knowledge and dominion could be drawn.
Id. at 115, 382 A.2d at 411.
This case falls in the first category. We believe that the totality of the circumstances surrounding the delivery of the package is sufficient to permit a reasonable jury to infer defendant's knowledge that the package contained marijuana. When Sergeant Fredrickson knocked on the door to the mobile home, a woman appeared at the window and motioned for him to go around to the back of the home. When the sergeant did not do so, defendant hurriedly walked from the back of the home towards him. This evidence tends to show that the occupant of the trailer was expecting a package, but wanted it delivered behind the trailer rather than to the front door.
As defendant was approaching Sergeant Fredrickson, he confirmed three times that he was John Michels, the package's addressee. Defendant even nodded his head and pointed to his chest in response to the question whether he was John Michels. Then, defendant signed "John Maico" on the delivery log and reached for the package. Neither "John Michels" nor "John Maico" bear any resemblance to defendant's actual name. Defendant only denied that his name was John Michels after he was arrested. In addition, a search of the trailer turned up at least two fake I.D.s for defendant, suggesting that defendant had reason to use false identities.
In sum, the circumstances surrounding the delivery reveal a desire for the delivery to occur out of the public eye. Defendant affirmatively sought and readily signed for an overnight package not addressed to him, using a name other than his own, in order to take possession of a package that had no return address and gave no indication as to who was sending it. And, defendant was prepared to use a false identity. We hold that these are incriminating circumstances sufficient to permit an inference that defendant knew the package contained marijuana. See also State v. Baldwin, 161 N.C. App. 382, 391, 588 S.E.2d 497, 505 (2003) (rejecting defendant's assertion that State failed to prove knowledge of cocaine in package he accepted, noting, among other circumstances, that "[a]lthough the package was addressed to someone else, defendant identified himself as the addressee and signed for the package using the name of the addressee"); State v. Kelly, 120 N.C. App. 821, 826, 463 S.E.2d 812, 815 (1995) (finding no error in trial court's denial of motion to dismiss possession charge where defendant had key to house, officers found letter addressed to defendant and items used to cut and package cocaine in house, and package addressed to Randy Brown was delivered by undercover officer to defendant, who stated he was Randy Brown).
Defendant analogizes this case to State v. Malloy, 309 N.C. 176, 177, 305 S.E.2d 718, 719 (1983), in which the defendant, when arrested, was working on a car next to another car in which officers found stolen guns. The Court held there was insufficient evidence to withstand a motion to dismiss, explaining that "the evidence introduced was sufficient to raise a strong suspicion of the defendant's guilt but not sufficient to remove that issue from the realm of suspicion and conjecture." Id. at 179, 305 S.E.2d at 720. The Court reasoned:
The evidence introduced did not tend to show that the defendant owned or controlled the automobile from which the stolen firearms were taken or the lot in which the automobile was parked. The evidence did not tend to show that the defendant ever mentioned the firearms, saw them or knew of their presence.
Id. Rather, the evidence only showed that "the defendant was working under the hood of an automobile parked in front of the automobile in which the stolen guns were located when the guns were taken from the trunk." Id.
Thus, the State in Malloy relied solely on the defendant's proximity to the contraband. In contrast, in this case, defendant assertively sought to obtain possession of the package containing the marijuana, purposefully and repeatedly using a false name to do so. The evidence in this case went beyond mere conjecture and speculation and was sufficient to allow a jury to find that defendant knew the package contained marijuana.
Defendant also challenges the sufficiency of the evidence to support his conviction for conspiracy to traffic. "To prove criminal conspiracy, the State must prove `an agreement between two or more people to do an unlawful act or to do a lawful act in an unlawful manner.'" State v. Wiggins, 185 N.C. App. 376, 389, 648 S.E.2d 865, 874 (quoting State v. Worthington, 84 N.C. App. 150, 162, 352 S.E.2d 695, 703, disc. review denied, 319 N.C. 677, 356 S.E.2d 785 (1987)), disc. review denied, 361 N.C. 703, 653 S.E.2d 160 (2007). The State is not required to present evidence of an express agreement. Rather, "[e]vidence tending to establish a 'mutual, implied understanding will suffice to withstand a defendant's motion to dismiss.'" Id. (quoting Worthington, 84 N.C. App. at 162, 352 S.E.2d at 703).
Defendant contends the State failed to present sufficient evidence of any agreement between defendant and the sender of the package. We disagree. In State v. Clark, 137 N.C. App. 90, 92, 527 S.E.2d 319, 320 (2000), the police found over 12 pounds of marijuana hidden inside a television set being shipped via UPS to a "Tisha Wilson" at an address that consisted of uninhabited apartments still under construction. When an officer posing as a UPS delivery person drove to the address written on the package, the defendant, who had been sitting with another man in a burgundy car, got out, stood near the building, and stared at him but did not approach. Id. When the officer returned to the UPS truck and drove out of the apartment complex, the defendant, driving the burgundy car with his passenger, followed him. When the officer stopped to feign delivery of another package, the passenger of the burgundy car "approached and paced in the vicinity of [the officer] and the stranger." Id. When the officer stopped again, the passenger approached the officer, asked for the package addressed to "Tisha Wilson," showed him the tracking number for the package, signed for it, and took possession of it. When the passenger returned to the burgundy car, officers then arrested both the defendant and the passenger. Id.
On appeal, the defendant argued the State failed to present sufficient evidence to support his conspiracy to traffic in marijuana conviction. Id. at 95, 527 S.E.2d at 322. The Court rejected that argument, explaining that although there was no direct evidence of an agreement between the defendant and his alleged co-conspirator, the circumstantial evidence that "[s]omeone shipped defendant and [the co-conspirator] a television in which twelve and one-half pounds of marijuana had been carefully concealed" and that "[d]efendant's actions showed an understanding of the nature of the contents of the package" was sufficient. Id. at 96, 527 S.E.2d at 322-23.
Here, we have similar evidence that someone shipped defendant marijuana in a package and that defendant's actions showed an understanding of the nature and contents of the package. The woman's actions in waiving the undercover officer to the back of the trailer indicate that someone at the residence was expecting a package and did not want it delivered to the front door. Defendant rushed from behind the trailer to meet the officer and readily admitted to being John Michels when asked, but signed John Maico, suggesting that he had been told how the package would be addressed  although not how the name was spelled. This evidence was sufficient to send to the jury the issue whether there was an agreement to traffic. We acknowledge, however, as to both charges, that this is a very close case.

II
Defendant next argues that the trial court committed plain error in allowing the jury to amend the verdict sheet in open court. After the jury returned the verdict, it was called to the attention of the trial judge that the verdict sheet listed the charge as trafficking in marijuana when it should have been attempted trafficking in marijuana. The following exchange occurred:
THE COURT: All right anything else of this jury on behalf of the State?
[THE STATE]: Just one, Judge. The verdict sheet for 08 CRS 52417, was that guilty of attempting to trafficking [sic] in marijuana?
THE COURT: That should be.
THE CLERK: Yes.
[THE STATE]: Okay.
THE CLERK: Right.
THE COURT: Now, anything else from this jury on behalf of 
[THE STATE]: Judge, there might be a clarification.
THE CLERK: No, it doesn't have it.
[THE STATE]: Excuse me?
THE CLERK: It needs to say attempted, this one says trafficking.
THE COURT: Let me see that.
(The Clerk appeared to hand the verdict sheet to the Court.)
THE CLERK: Do you want me to change that?
THE COURT: We apparently did not check that verdict sheet. It should be attempted 
FOREPERSON: Yes, Your Honor. We brought that to the attention of the Bailiff.
THE COURT: And let me ask you  let me clarify this with the jury right now.
In 08 CRS 52417, the defendant was arraigned and tried on the charge of attempted trafficking in marijuana and is the jury's verdict a verdict of guilty of attempted trafficking in marijuana?
FOREPERSON: Yes, sir.
THE COURT: And if that is, in fact, the case, would each of you please raise your right hand?
(The jurors appeared to raise their hands.)
THE COURT: All right. I believe we have clarified that. And if you will change that on the verdict sheet, I'm going to have the Foreperson initial that, that certain change.
THE CLERK: Is it 
[THE STATE]: No, sir, it would be the same verdict sheet.
THE COURT: Well, it might be just as easy to do a new verdict sheet and let you redo the verdict sheet for us if you don't mind doing that.
FOREPERSON: Yes, sir.
THE COURT: While I've got all the jury here. Guilty of attempt to traffic in marijuana. If you'll re-do that for me, sir.
(The Bailiff appeared to hand the verdict sheet to the Foreperson.)
THE COURT: You need something to write on?
FOREPERSON: I've got it. I've got it. Thank you, sir.
THE COURT: I don't want to get to the sentencing hearing until he's finished.
[THE STATE]: Yes, sir, I could  yes, sir.
(The Bailiff appeared retrieve [sic] the verdict sheet and handed the verdict sheet back to the Court.)
THE COURT: All right, now we're correct. Thank you, sir.
(Emphasis added.) According to defendant, once the error on the verdict sheet was discovered, the trial court was required to send the jury back to the jury room to fill out a corrected sheet.
In State v. Odom, 307 N.C. 655, 660, 300 S.E.2d 375, 378 (1983) (quoting United States v. McCaskill, 676 F.2d 995, 1002 (4th Cir.), cert. denied, 459 U.S. 1018, 74 L. Ed. 2d 513, 103 S. Ct. 381 (1982)), the Supreme Court explained:
"[T]he plain error rule . . . is always to be applied cautiously and only in the exceptional case where, after reviewing the entire record, it can be said the claimed error is a fundamental error, something so basic, so prejudicial, so lacking in its elements that justice cannot have been done, or where [the error] is grave error which amounts to a denial of a fundamental right of the accused, or the error has resulted in a miscarriage of justice or in the denial to appellant of a fair trial or where the error is such as to seriously affect the fairness, integrity or public reputation of judicial proceedings or where it can be fairly said the instructional mistake had a probable impact on the jury's finding that the defendant was guilty."
"In deciding whether a defect in the jury instruction constitutes 'plain error,' the appellate court must examine the entire record and determine if the instructional error had a probable impact on the jury's finding of guilt." Id. at 661, 300 S.E.2d at 378-79.
As an initial matter, we note that "plain error analysis applies only to jury instructions and evidentiary matters . . . ." State v. Wiley, 355 N.C. 592, 615, 565 S.E.2d 22, 39-40 (2002), cert. denied, 537 U.S. 1117, 154 L. Ed. 2d 795, 123 S. Ct. 882 (2003). Since the verdict sheet error does not involve either, it is questionable whether plain error even applies.
Assuming arguendo that plain error does apply, however, we hold that the trial court did not err. Our appellate courts have repeatedly recognized that a trial court has the inherent authority to amend clerical errors in a verdict or judgment. "[A] court of record has the inherent power to make its records speak the truth and, to that end, to amend its records to correct clerical mistakes or supply defects or omissions therein." State v. Davis, 123 N.C. App. 240, 242-43, 472 S.E.2d 392, 393 (1996).
In State v. Gilbert, 139 N.C. App. 657, 672, 535 S.E.2d 94, 102 (2000), the defendant argued the trial court erred in denying his motion for a mistrial after it was discovered that the jury's verdict was returned on a verdict sheet captioned in the name of a different defendant. The error on the verdict sheet had not been discovered until after the jury was released. The trial court ruled that it was a typographical error, and on appeal, this Court affirmed. The Court reasoned:
In the case at bar, the verdict sheet lists the proper file number for the case, and the proper charges listed are consistent with the evidence presented at trial and with the court's instructions. The transcript and exhibits are replete with references to defendant by name, Jan C. Gilbert. After the verdict was returned, the jury was polled, and each juror affirmed his or her vote that defendant was guilty. We do not perceive that the error in the verdict form resulted in any prejudice to defendant. This assignment of error is overruled.
Id. at 674, 535 S.E.2d at 104.
We think this case is similar and, therefore, requires a like result. Here, the trial judge properly instructed the jury on the charge of attempted trafficking and the elements of that crime. At the end of the charge to the jury, the trial judge appeared to read from a verdict sheet, saying: "The first alternative is guilty of attempt to traffic in marijuana or not guilty." When the actual verdict sheet used by the jury contained the error, the trial judge asked the clerk to correct the error and then read the corrected verdict sheet. The foreperson explained that the jury had noticed the error when they were deliberating and had brought the error to the attention of the bailiff. The trial court then polled the jury, confirming that they had each voted that defendant was guilty of attempted trafficking, and the foreperson completed a new verdict sheet with the correct charge. It was thus clear that the jury intended to convict defendant of attempted trafficking. The trial court's amendment to the verdict sheet to correct the clerical error was, therefore, proper.
Defendant, however, points to State v. Coleman, 176 N.C. App. 408, 626 S.E.2d 876, 2006 WL 539411, 2006 N.C. App. LEXIS 508 (unpublished), cert. denied, 360 N.C. 539, 634 S.E.2d 537 (2006). Unpublished decisions are not controlling. Nonetheless, in Coleman, the jury sent a message to the judge that there had been a mistake in filling out the verdict sheet, and the judge, with the State's and defendant's consent, brought the foreperson back into the courtroom and instructed him on how to correct the verdict sheet. On appeal, defendant argued the trial court committed plain error in bringing only the foreperson back into the courtroom. The Court rejected that argument, holding that if any error occurred at all, it was harmless. Id. at *5, 2006 N.C. App. LEXIS at *15. The focus in Coleman was on whether the trial court was required to bring the entire jury back into the courtroom to correct the verdict sheet, an issue that the Court did not resolve. Nothing in Coleman supports defendant's contention that the trial court was required to send the jury back into the jury room to re-deliberate after the verdict sheet was corrected. As defendant cites no other authority in support of this argument, we find no error.
No error.
Judges ROBERT C. HUNTER and STEELMAN concur.
Report per Rule 30(e).